(80 P.3d 1190)

No. 89,003

STATE OF KANSAS, *Appellee*, v. JUSTIN D. ELNICKI, *Appellant*.

Opinion filed December 31, 2003.

*Patrick H. Dunn*, assistant appellate defender, for the appellant.

*Deborah Hughes*, assistant district attorney, *Robert D. Hecht*, district attorney, and *Phill Kline*, attorney general, for the appellee.

Before PIERRON, P.J., GREENE, J., and JONES, S.J.

PIERRON, J.: Justin D. Elnicki appeals his conviction by a jury of one count of rape and one count of aggravated criminal sodomy. Elnicki challenges the sufficiency of the evidence, submission of

certain evidence, prosecutorial misconduct, and sentencing. We affirm.

According to testimony presented at trial, at approximately 2 a.m., J.A. rode a bike to a Kwik Shop in north Topeka to use the pay phone. While J.A. spoke on the phone, Elnicki arrived in a Chevrolet Blazer. J.A. commented to Elnicki about his tattoos and they engaged in small talk. Elnicki pointed out that the tire on J.A.'s bike was flat and offered her a ride. J.A. told Elnicki she did not know him and that she was only a couple blocks from her friend's house anyway. Elnicki persisted and J.A. eventually accepted the ride.

J.A. testified she had Elnicki stop in the church parking lot behind her friend's house because her friend did not like strange people coming to his house. As J.A. attempted to get her bike out of the Blazer, Elnicki grabbed her hair and said, "Bitch, take off your clothes." J.A. screamed for help and Elnicki hit her with his fists, threw her to the ground, kicked her, and choked her until she could no longer scream. J.A. testified she blacked out. After J.A. regained consciousness, Elnicki grabbed her by the hair and dragged her toward an open door of the Blazer. Elnicki removed J.A.'s shoes, pants, and underwear. Elnicki grabbed J.A. by the hair and forced her to perform oral sex on him while she knelt on the pavement.

Elnicki then forced J.A. into the Blazer, telling her he would kill her if she did not get in. Elnicki closed the door and laid on top of J.A. He rubbed his penis against her vagina and anal area in an attempt to get an erection. Elnicki forced J.A. to perform oral sex again. Elnicki was able to get an erection and forcibly had sex with her. J.A. said Elnicki ejaculated. Elnicki pulled J.A. out of the Blazer and told her he would kill her if she told anyone. He removed J.A.'s bike from the Blazer, threw it on the ground, and drove away. J.A. ran to her friend's house and reported the rape. Her friends took her to another house where she called her parents and they took her to the hospital for a sexual assault examination. J.A. had bumps, bruises, and scratches all over her body.

J.A. testified she told the police and several other people that Elnicki had followed her from the Kwik Shop and attacked her

from behind in the church parking lot. She was embarrassed that she had gotten into the Blazer with Elnicki and she did not want her parents to know she had accepted a ride from a stranger. J.A. admitted to drinking alcohol and smoking marijuana earlier in the evening. The next day, J.A. told Detective Hazim that she had actually accepted a ride from Elnicki before the rape.

Elnicki was arrested and interviewed by Detective Hazim. The interview was videotaped. Elnicki first said he had not met a girl on the night in question or had sex with anyone. He said he had been drinking at a bar at the relevant time and then went home. He explained the scratches on his neck as a result of a fight with a friend. After Detective Hazim confronted him with some of the information given by J.A., Elnicki said that he was too drunk to remember what happened and that he could have had sex with a girl but he did not remember.

Detective Hazim then confronted Elnicki with more information. Elnicki then stated he had gone to the Kwik Shop to buy cigarettes for his girlfriend. He met a girl and they talked about getting some marijuana. They got in his Blazer and at some point they started kissing. He said she gave him oral sex as he was sitting with the door open and she was on her knees. He was unable to get an erection, he never ejaculated, and that was all that happened.

The rape examination and subsequent analysis revealed a pubic hair identified as Elnicki's. The vaginal swabs came back positive for semen belonging to Elnicki. The blood stains discovered in the Blazer were determined to be blood from J.A.

Before trial, Elnicki's ex-wife gave Detective Hazim a letter written by Elnicki. In the letter, Elnicki gave another account of the events on the evening in question. Elnicki said that he picked up J.A. at the Kwik Shop and they were unsuccessful in buying some marijuana.

Elnicki said they ended up in a parking lot and used methamphetamine. Elnicki said he offered J.A. $25 to "get freaky" with him and they started fooling around. He noticed she had a shaved vagina and she told him "her man liked it that way." He said she gave him oral sex outside of the driver's side door as she knelt on

the pavement. He was unable to get an erection and told her to get in the truck because he was afraid they would be seen. In the truck, J.A. gave him more oral sex.

He said they tried to have sex, but he never got an erection and they gave up. Elnicki said J.A. asked for her $25 but he would not pay her because nothing happened. They argued and he told her to get out of his truck. She grabbed his neck and scratched him. Elnicki said he was mad and punched her a couple times. She ran but he caught her. Elnicki had J.A. in a headlock and she bit him in the side. Elnicki said he punched her again and then drove away.

Elnicki was charged with rape, aggravated sodomy, and aggravated kidnapping. The trial court dismissed the charge of aggravated kidnapping during the trial. A jury convicted Elnicki on both counts of rape and aggravated sodomy. Elnicki was sentenced to a presumptive sentence of 618 months' incarceration for the rape and a concurrent sentence for the aggravated sodomy.

Elnicki first claims the trial court abused its discretion in refusing to redact portions of evidence from the videotaped interrogation because Detective Hazim commented on Elnicki's veracity during the interrogation and this invaded the province of the jury in determining guilt.

Elnicki complains of several incidents. Approximately 7 minutes into the interrogation, Detective Hazim told Elnicki, "You just told me a flat out lie." Detective Hazim told Elnicki that a person's eyes shift when they are lying and that his eyes had shifted. Detective Hazim later called Elnicki a liar and asserted that he was "weaving lies." Detective Hazim also repeatedly asserted that Elnicki was "bullshitting" him and that "all this bullshit is a waste of my time." Detective Hazim also told Elnicki, "Bullshit, you're sitting here bullshitting me" and "Let's not bullshit anymore."

A witness may not testify about the credibility of another witness. The jury is the sole factfinder in a criminal case and a witness cannot give an opinion on the guilt or innocence of the defendant. See *State v. Steadman*, 253 Kan. 297, 304, 855 P.2d 919 (1993). Determining the veracity of a witness' statements is a function of the jury. See *Jackson v. Denno*, 378 U.S. 368, 386-87 n. 13, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964) ("Just as questions of admissi-

bility of evidence are traditionally for the court, questions of credibility, whether of a witness or a confession, are for the jury.").

Elnicki argues the videotape should have been redacted because Detective Hazim could not have taken the stand and made the same comments. He argues there would be no prejudice to the State or hindrance of the State's case if the videotape was redacted.

Several other jurisdictions have struggled with the issue of whether credibility statements made by an interrogating officer in the course of a videotaped interrogation should be played for the jury. A plurality opinion on the subject comes from the Washington Supreme Court, which affirmed the conviction of a man for robbery and kidnapping. *State v. Demery*, 144 Wash. 2d 753, 30 P.3d 1278 (2001). The *Demery* court confronted the issue of whether officers' statements during a videotaped interrogation accusing Demery of lying were admissible at trial.

During the interrogation, officers asked Demery whether he intended to stick to his version of events and Demery replied that he did because he was telling the truth. Officers then asked Demery whether they had treated him well during the interrogation. Demery replied that they had, but that the officers were looking at him like he was lying. The officers stated that they were looking at Demery like that because he was lying. The statements were not redacted from the videotape that was played for the jury.

On appeal, Demery asserted the officers' statements constituted inadmissible lay opinion testimony regarding his credibility. Four justices of the Washington court disagreed, concluding that because the officers' statements were not made under oath at trial, they did not constitute testimony. Rather, the four-justice plurality opinion explained that the statements were a common interview technique employed to see if Demery would change his story. 144 Wash. 2d at 764. The court also observed that the trial court's purpose in admitting the statements was to provide context for Demery's responses and not to impeach his credibility. However, five justices of the Washington court concluded that it was error to admit the statement. Those five justices agreed that the officers' statements constituted impermissible opinion testimony. 144 Wash. 2d at 772-73. Although the majority agreed that the state-

ments were error, the four dissenting justices believed the error was reversible, while one concurring justice believed it was harmless. Thus, the majority affirmed Demery's conviction.

The Ninth Circuit Court of Appeals has also addressed this issue in *Dubria v. Smith*, 224 F.3d 995, 1003 (9th Cir. 2000). Dubria raised this claim in the context of a habeas corpus proceeding, which required him to prove that the admission of the videotaped testimony violated his right to due process under the United States Constitution. The court first observed that the videotape played at trial portrayed an "unremarkable interview" because the officers' comments suggested nothing more than what the State sought to prove at trial. 224 F.3d at 1001. The court agreed that there was nothing particularly damning in the officers' statements. It also noted that the officers' comments were admitted to place Dubria's answers in context. Finally, the court noted that any error in the admission of the statements was cured by the trial courts' limiting instruction, directing the jury not to assume that the officers' statements during the interrogation were true. Although the court determined that the admission of the videotaped statements did not violate Dubria's right to due process, it did not decide whether the admission of the statements violated the rules of evidence. See *State v. Cordova*, 137 Idaho 635, 51 P.3d 449 (Idaho App.), *rev. denied* (Aug. 8, 2002).

To the contrary, another appellate court has held that interrogating officers' comments accusing the defendant, either directly or indirectly, of lying were properly excluded from the jury. See *Commonwealth v. Kitchen*, 1999 Pa. Super. 100, 730 A.2d 513, 521-22 (1999). In *Kitchen*, the videotape depicted the interrogating officers telling the defendant, "You're lying" and, "We know that you're lying." 730 A. 2d at 721. The court held that such statements were akin to a prosecutor offering his or her opinion of the truth or falsity of the evidence presented by a criminal defendant, or a prosecutor offering his or her opinion regarding the guilt or innocence of the defendant, either of which would be inadmissible at trial. See also *State v. Jones*, 117 Wash. App. 89, 92, 68 P.3d 1153 (2003) ("We find no meaningful difference between allowing an officer to testify directly that he does not believe the defendant

and allowing the officer to testify that he told the defendant during questioning that he did not believe him. In either case, the jury learns the police officer's opinion about the defendant's credibility.").

The State concedes that a witness may not testify that another witness is or is not telling the truth, but argues that Detective Hazim did not comment on Elnicki's credibility. Rather, according to the State, Detective Hazim simply explained his "interrogation technique" to the jury. The State cites multiple sources concerning the interrogation techniques used by Detective Hazim while he interrogated Elnicki.

We agree with the State that Detective Hazim's persistent and successful efforts at interrogating Elnicki, with the strength of the evidence against Elnicki and the improbability of his claims, explained Elnicki's gradual movement from total denial of seeing J.A. to a story of nonviolent, consensual oral sex. An interrogator's comments that he or she believes the suspect is lying are only admissible to the extent that they provide context to a relevant answer by the suspect. Otherwise, interrogator comments that result in an irrelevant answer should be redacted. Detective Hazim's statements in this case that he believed Elnicki was lying and "bullshitting" were admissible because the comments gave context to Elnicki's inculpatory statements, which were relevant to the proceedings. The trial court did not abuse its discretion in refusing to redact the requested portion of Elnicki's interrogation.

We do, however, caution that this type of evidence is fraught with possible problems. It is obvious that if a defendant does not change his or her story in any significant way under this kind of questioning, a different view must be taken. In those situations where it is not undisputed that the defendant lied and changed his or her story, such evidence, which includes statements that the defendant is lying, should probably be excluded unless there is another reason for its admission.

Even when such evidence is allowed, it would probably be the better practice to give a cautionary instruction to the jury that statements made by officers in the course of interrogation are not sworn

testimony and that only the jury can make determinations of the veracity of witnesses.

Elnicki also alleges the State committed prosecutorial misconduct in its closing argument by commenting on his credibility. He contends the case was a credibility battle and the prosecutor improperly attempted to destroy his credibility by repeatedly arguing that he lied, fabricated his story, "spun a yarn", and by stating that the State's version of the events was true. Elnicki did not object to any of the comments during the State's closing argument, but now challenges them on appeal.

An appellate court's standard of review is the same whether an objection was or was not made at trial. To show reversible error based on prosecutorial misconduct, the defendant must show the alleged error denied the defendant his or her right to a fair trial under the Fourteenth Amendment to the United States Constitution. *State v. Davis*, 275 Kan. 107, 121-22, 61 P.3d 701 (2003). Our standard of review of this type of claim is well established:

"The analysis of the effect of a prosecutor's alleged improper remarks in closing argument is a two-step process. First, we decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as the argument is consistent with the evidence. Second, we must decide whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal." *State v. Pabst*, 268 Kan. 501, 505, 996 P.2d 321 (2000).

In *State v. Wilt*, 273 Kan. 273, 279, 44 P.3d 300 (2002), the court cited three factors for determining whether prosecutorial misconduct requires a new trial:

"(1) whether the misconduct was so gross and flagrant as to deny the accused a fair trial, (2) whether the remarks show ill will on the prosecutor's part, and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that it can be said that the prejudicial remarks of the prosecutor were likely to have little weight in the minds of the jurors. [Citation omitted.]"

The evidence garnered in this case from Elnicki's changing story gives proper context to the prosecutor's comments that Elnicki was "spinning a yarn", telling a "fairy tale", and fabricating the truth.

The prosecutor's comments were elicited from direct evidence of Elnicki's ever-changing story and the prosecution's comparison of one story to the next as Elnicki learned of the evidence against him.

Elnicki recognizes that the State was free to point out that his version of the events changed during the interrogation and prior to trial, but contends that the State improperly used sarcasm to interject its opinion as to his veracity. The prosecutor's comments were not outside the limits the prosecutor is allowed in discussing the evidence. The prosecution is allowed wide latitude in language and in manner or presentation of closing argument as long as the argument is consistent with the evidence. Elnicki's ever-changing story is consistent with arguments that his rendition of the facts could be questioned. The prosecution's comments were not improper. See *State v. Finley*, 273 Kan. 237, 246, 42 P.3d 723 (2002) ("The prosecutor based her argument on an inference drawn from the nature of the defendant's conflicting stories, not on the prosecution's knowledge of the defendant's veracity.").

Elnicki also complains that the prosecutor expressed his personal opinion and vouched for J.A. by arguing that she was telling the truth: "He is threatening her. He is threatening the whole time. The force, she is very consistent about the force he was using, does not change on the force at all. And the demands he was making, the things he was saying to her, you know she was telling the truth."

The prosecutor's above comments occurred in rebuttal following defense counsel's closing argument containing repeated characterization of J.A.'s testimony as a "train of lies," stating how rape victims would not act like J.A., making statements like "[w]ho is the better liar here?", and pointing out the inconsistencies of her testimony. The prosecutor attempted to rehabilitate J.A. in closing argument by pointing out the consistencies in her testimony and the physical evidence that supported her testimony and refuted Elnicki's explanations. The prosecutor's comments culminated in the reasonable inference that J.A. was telling the truth. See *Davis*, 275 Kan. at 122 (prosecutor did not improperly vouch for the credibility of witness by stating, "I would suggest to you that the evi-

dence has shown that [the victim] should be believed by you and that you should return verdicts on all of those counts.").

The facts of each case must be scrutinized in determining whether the prosecutor's conduct denied the defendant a fair trial. See *State v. Rodriguez*, 269 Kan. 633, 641, 8 P.3d 712 (2000). Based on the facts of this case, we do not find the prosecutor's comments during closing argument were improper or that they denied Elnicki a fair trial.

Next, Elnicki argues there was insufficient evidence to support his convictions and the State failed to prove its case beyond a reasonable doubt. See *State v. Barker*, 18 Kan. App. 2d 292, 295, 851 P.2d 394 (1993) (due process clause protects accused against conviction except upon proof beyond reasonable doubt of every fact necessary to constitute criminal charges).

The standard of review to a challenge of the sufficiency of the evidence is well known:

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Jamison*, 269 Kan. 564, 571, 7 P.3d 1204 (2000).

The evaluation of witness credibility is for the jury. *State v. McCray*, 267 Kan. 339, 343, 979 P.2d 134 (1999).

Elnicki argues the physical evidence was consistent with both his and J.A.'s story and that the case "boiled down to a credibility contest." He states that J.A. was an admitted liar by having first told several people that Elnicki had attacked her from behind. He states that J.A. lied at the hospital when she told the prosecutor that Elnicki had forced her to have vaginal intercourse in the parking lot before forcing her to have intercourse in the Blazer. He contends J.A.'s story was internally inconsistent because she claimed she did not want her parents to know that she accepted a ride from a stranger, yet she told the same lie to several people outside the presence of her parents. He states that J.A.'s story that her friend would be mad if a stranger dropped her off at his house was refuted by that friend in his testimony. J.A. claimed she had

known her friend for 7-8 years, but the friend testified he had only known J.A. for a year.

Elnicki also points out the inconsistencies in J.A.'s testimony about the actual incident. He states that J.A. told Detective Hazim that Elnicki initiated the conversation, but at trial she stated she initiated the conversation by mentioning his tattoos. J.A. testified Elnicki removed her clothes, but she told Officer Kizhaber that she removed her pants. J.A. testified Elnicki was unable to get an erection until inside the Blazer, but she told Officer Kizhaber that Elnicki had an erection outside the Blazer. J.A. testified Elnicki did not penetrate her anus, but the sexual assault nurse stated that J.A. told her Elnicki digitally penetrated her anus.

Elnicki also claims a rape victim would not tell her name to a would-be attacker, would not talk about her shaved vagina, would not talk about her attacker's past girlfriends, and would not direct a would-be attacker to an abandoned parking lot. He argues these are the actions of a woman preparing to engage in consensual sex acts.

After pointing out all the consistencies of the evidence supporting a consensual encounter, Elnicki argues that even if the evidence is viewed in the light most favorable to the State, the evidence did not support his convictions. We disagree. Elnicki is asking us to find there is no way a reasonable jury could find him guilty based on the inconsistencies of J.A.'s testimony. He also presents his version as what must be accepted. The jury sorted through all the inconsistencies claimed by Elnicki and found J.A.'s story to be the more credible—that is the jury's responsibility. This court does not weigh conflicting evidence, pass on credibility, or redetermine questions of fact. *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 387, 22 P.3d 124 (2001). We find there is sufficient evidence to support Elnicki's convictions. While a set of facts may be so improbable as to be insufficient to support a conviction, see *State v. Matlock*, 233 Kan. 1, 660 P.2d 945 (1983), that is not the case here.

Elnicki finally argues the trial court erred at sentencing by using his criminal history score to determine the sentence for his nonbase crimes. He argues the sentence must be vacated and remanded for resentencing.

Elnicki's criminal history score was B. The trial court sentenced Elnicki to 618 months' incarceration on the rape conviction, the base crime, using a B criminal history. However, the court erroneously used the B criminal history for the aggravated criminal sodomy conviction. The trial court should have sentenced Elnicki for aggravated criminal sodomy using a criminal history score of I. K.S.A. 2002 Supp. 21-4720(b)(5) requires the court to sentence a defendant using a no criminal history, or I, for all nonbase crimes in a multiple conviction situation.

Although the trial court erroneously sentenced Elnicki on the aggravated criminal sodomy conviction, we note that the sentence was ordered to run concurrent with the sentence of the base conviction of rape. The aggravated criminal sodomy sentence was substantially shorter than the sentence for rape, and the sentence for rape is not affected by the application of K.S.A. 2002 Supp. 21-4720(b)(5). Elnicki's sentence will not change unless the base sentence is substantially changed.

Elnicki also argues the trial court erred by including his juvenile adjudication in his criminal history. He contends his juvenile adjudication must be pleaded in the charging document and proved to a jury beyond a reasonable doubt pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

Elnicki's argument was previously rejected by our Kansas Supreme Court in *State v. Hitt*, 273 Kan. 224, Syl. ¶ 2, 42 P.3d 732 (2002), *cert. denied*, 537 U.S. 1104 (2003): "Juvenile adjudications need not be charged in an indictment or proven to a jury beyond a reasonable doubt before they can be used in calculating a defendant's criminal history score under the Kansas Sentencing Guidelines Act." Elnicki argues *Hitt* was wrongly decided. However, we are duty bound to follow Kansas Supreme Court precedent. See *Mueller v. State*, 28 Kan. App. 2d 760, 763, 24 P.3d 149, *rev. denied* 231 Kan. 1037 (2001), *cert. denied* 535 U.S. 997 (2002).

Last, Elnicki argues the first three issues raised on appeal, even if not individually prejudicial, in combination constitute sufficient prejudice to require a new trial based on cumulative error. We disagree. The cumulative trial error rule is clearly defined as follows:

" 'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant.' *State v. Lumbrera*, 252 Kan. 54, Syl. ¶ 1, 845 P.2d 609 (1992)." *State v. Plaskett*, 271 Kan. 995, 1022, 27 P.3d 890 (2001).

With the conclusions we have reached on Elnicki's other appellate issues, his argument that cumulative errors deprived him of a constitutionally fair trial has no merit. We find no prejudicial trial errors upon which such a claim could be predicated. Further, an examination of the record clearly shows Elnicki was given a vigorous defense and allowed to portray the event as a consensual encounter. The trial may not have been perfect, but it was certainly a fair one. Elnicki's argument of cumulative error fails.

Affirmed.

GREENE, J., concurring.

I agree with the majority on the issues of prosecutorial misconduct, sufficiency of the evidence, and sentencing, but I file this concurring opinion because I would hold that the videotaped statements of the officer that attack the veracity of Elnicki were inadmissible and should either have been redacted or a cautionary instruction should have been given. In my view, the majority's "better practice" should be elevated to an evidentiary requirement. Finding the error harmless in this case, however, I would not reverse the convictions.

The State defends the admissibility of such statements on the basis that they were part of the interrogation process. The State included in its brief several authorities that recognize that confrontation of the suspect with strong accusations of not telling the truth can be successful in convincing the suspect that it is futile to continue to resist telling the truth. See, *e.g.*, Inbau, Reid & Buckley, Criminal Interrogation and Confessions 131 (3d ed. 1986). Frankly, this approach may be successful in the interrogation of criminal suspects, but I find such authorities completely immaterial on the issue of admissibility at trial.

Our Supreme Court has consistently held that the determination of the truthfulness of a witness is for the jury, and that it can be reversible error to permit witnesses to express their view on issues of credibility. See, *e.g., State v. Plaskett,* 271 Kan. 995, 1008-09, 27 P.3d 890 (2001). My review of these cases demonstrates that the usual target of an opinion regarding credibility is an accusing witness; when the target is the defendant, the constitutional stakes are at least as high, if not higher.

Most courts that have addressed this issue have concluded that admission of such statements is error, especially if not accompanied by a cautionary instruction. The majority of the Washington Supreme Court in *State v. Demery,* 144 Wash. 2d 753, 765-73, 30 P.3d 1278 (2001) (the concurring and dissenting opinions), as well as the Pennsylvania Supreme Court in *Commonwealth v. Kitchen,* 1999 Pa. Super. 100, 730 A.2d 513, 521 (1999) concluded that it is improper to admit officers' opinions of credibility of a criminal defendant. Moreover, the Idaho Court of Appeals concluded that admission of such evidence is error if not accompanied by a limiting instruction. *State v. Cordova,* 137 Idaho 635, 51 P.3d 449, 456 (Idaho App.), *rev. denied* (Aug. 8, 2002).

"When the troopers stated to Appellee, 'You're lying', or 'we know that you're lying' or phrases to that effect, their statements were akin to a prosecutor offering his or her opinion of the truth or falsity of the evidence presented by a criminal defendant, and such opinions are inadmissible at trial. [Citation omitted.] The troopers' statements could also be analogized to a prosecutor's personal opinion, either in argument or via witnesses from the stand, as to the guilt or innocence of a criminal defendant, which is inadmissible at trial." *Kitchen,* 730 A.2d at 521.

Although the Ninth Circuit United States Court of Appeals in *Dubria v. Smith,* 224 F.3d 995, 1002 (9th Cir. 2000), concluded that there was no error in admitting such statements, the case is not particularly comforting, given that: (i) the issue was raised in a habeas proceeding and the court applied a standard requiring that the statements must have so fatally infected the proceedings as to render them fundamentally unfair; and (ii) the court was especially influenced by the fact that the trial court gave two specific cautionary instructions, which were presumed to have cured any prejudicial impact.

Consistent with these authorities, I would hold that the barrage of officers' accusations that Elnicki was "a liar" or "was weaving lies" either should have been redacted or should have been admitted with a cautionary instruction. To admit such evidence without the instruction was error.

Even the majority concedes that this is the "better practice"; I respectfully suggest that the majority opinion does not foster the better practice, but rather assures that police officers will routinely include their personal opinions on the credibility and guilt of the accused in every taped interview they conduct, knowing that this is the most likely way to get their otherwise inadmissible opinions before a jury. See *Demery*, 144 Wash. 2d at 773 (Sanders, J., dissenting). *Nemo potest facere per obliquuum quod non potest facere per directum.*

Although I would find error in the failure to redact without giving a cautionary instruction, the error was harmless in this case. I have reviewed the entirety of the taped interview and conclude without difficulty that redaction would not have changed the outcome in this case. See *State v. Bell*, 266 Kan. 896, 920, 975 P.2d 239, *cert. denied* 528 U.S. 905 (1999).